199 P.2d 255

**Application of NICHOLS.**

**UNION PAC. STAGES, Inc. v. NICHOLS et al.**

**No. 7476.**

Supreme Court of Idaho.

Nov. 5, 1948.

L. H. Anderson, of Pocatello, for protestant-appellant.

Maurice H. Greene and Raymond D. Givens, both of Boise, for respondent.

Robert E. Smylie, Atty. Gen. and Don J. McClenahan, Asst. Atty. Gen., for Public Utilities Commission.

HOLDEN, Justice.

On or about October 16, 1947, applicant, A. C. Nichols, doing business as Valley Bus Line, hereinafter called respondent, filed an application with the Public Utili-

ties Commission for a permit to operate as an auto transportation company in the transportation of passengers, express, mail and newspapers for hire between Ashton and Pocatello, Idaho. On or about October 25, 1947, Union Pacific Stages, hereinafter called, appellant, filed a protest and petition in intervention, upon the ground, among others, that the public transportation needs and necessities were adequately served and that good cause and public interest did not exist for the granting of a permit. The Commission set the matter for hearing at Idaho Falls and hearing was had November 21, 1947, at which time testimony was adduced for and in behalf of respondent and appellant. Following the conclusion of the hearing the Commission took the matter under advise-

ment and, March 8, 1948, made and· entered its order granting the application and authorizing the issuance of a permit to respondent to operate passenger and express service between Pocatello and Ashton, Idaho, as a common carrier, as prayed for in the application. Appellant then filed its petition for rehearing which was, April 1, 1948,·denied by the Commission. Union Pacific Stages appeals to this court from both the order granting respondent's application and from the order denying its petition for rehearing.

It appears respondent owns one 1946 sixteen-passenger Pony Cruiser, which he proposed to operate over U. S. Highways 91 and 191, under the following time schedule:

| "Down | | | | | Up | |
|-------|---|---|----------------|-----|---------|-----|
| Daily | | | | | Daily | |
| 8:00 | am | Lv | Ashton | Ar | 5:25 | pm |
| 8:19 | am | Lv | Chester | Lv | 5:06 | pm |
| 8:30 | am | Lv | St. Anthony | Lv | 4:55 | pm |
| 8:47 | am | Lv | Sugar City | Lv | 4:38 | pm |
| 8:57 | am | Lv | Rexburg | Lv | 4:28 | pm |
| 9:09 | am | Lv | Thornton | Lv | 4:16 | pm |
| 9:14 | am | Lv | Lorenzo | Lv | 4:11 | pm |
| 9:24 | am | Lv | Rigby | Lv | 4:01 | pm |
| 9:36 | am | Lv | Ucon | Lv | 3:49 | pm |
| 9:55 | am | Ar | Idaho Falls | Lv | 3:30 | pm |
| 10:10 | am | Lv | Idaho Falls | Ar | 3:03 | pm |
| 10:25 | am | Lv | Shelley | Lv | 2:48 | pm |
| 10:35 | am | Lv | Firth | Lv | 2:38 | pm |
| 10:57 | am | Lv | Blackfoot | Lv | 2:16 | pm |
| 11:18 | am | Lv | Ft. Hall | Lv | 1:55 | pm |
| 11:40 | am | Ar | Pocatello | Lv | 1:30 | pm" |

It also appears Union Pacific Stages is operating eight schedules each way per day, four of which schedules operate beyond Idaho Falls to and from St. Anthony, and three of which operate beyond Idaho Falls to and from Ashton, Idaho, such schedules being as follows:

|  |  | "Pocatello |  |  | Idaho Falls |  | St. Anthony |  | Ashton |  |
|---|---|---|---|---|---|---|---|---|---|---|
| "Northbound |  |  |  |  |  |  |  |  |  |  |
| Run 721 | Lv. | 7:00 | am | Ar. | 8:35 | AM | 10:19 | AM | 10:50 | AM |
| Run 751 |  | 9:30 | AM |  | 11:00 | AM |  |  |  |  |
| Run 753 |  | 11:00 | AM |  | 12:30 | PM | 2:05 | PM |  |  |
| Run 725 |  | 1:00 | PM |  | 2:30 | PM |  |  |  |  |
| Run 723 |  | 3:00 | PM |  | 4:30 | PM | 6:09 | PM | 6:40 | PM |
| Run 755 |  | 5:15 | PM |  | 6:45 | PM |  |  |  |  |
| Run 727 |  | 6:20 | PM |  | 7:55 | PM | 9:30 | PM | 10:00 | PM |
| Run 733 |  | 10:40 | PM |  | 12:10 | AM |  |  |  |  |

|  |  | Ashton |  | St. Anthony |  | Idaho Falls |  | Pocatello |  |
|---|---|---|---|---|---|---|---|---|---|
| Southbound |  |  |  |  |  |  |  |  |  |
| Run 724 | Lv. |  |  |  |  | 6:30 | AM | Ar. 8:00 | AM |
| Run 728 |  | 7:00 | AM | 7:23 | AM | 8:55 | AM | 10:25 | AM |
| Run 750 |  |  |  |  |  | 11:15 | AM | 12:45 | PM |
| Run 732 |  | 11:45 | AM | 12:10 | PM | 2:00 | PM | 3:30 | PM |
| Run 752 |  |  |  |  |  | 2:45 | PM | 4:15 | PM |
| Run 722 |  |  |  | 4:00 | PM | 5:30 | PM | 7:00 | PM |
| Run 754 |  |  |  |  |  | 8:00 | PM | 9:30 | PM |
| Run 734 |  | 7:15 | PM | 7:38 | PM | 9:20 | PM | 10:50 | PM" |

It further appears such schedules serve the intermediate points between Pocatello, St. Anthony and Ashton and handle passengers, baggage, express and newspapers, and that all of the buses have a capacity of 37 passengers except Runs 750 and 751 which have a capacity of 29.

That in addition to the aforesaid service, the Union Pacific Railroad Company operates two daily passenger trains each way between Pocatello and Idaho Falls as follows:

"Train No. 29 Lv. Pocatello   1:40 AM
            Ar. Idaho Falls 3:15 AM
Train No. 33 Lv. Pocatello   5:40 AM
            Ar. Idaho Falls 7:25 AM
and Southbound:
Train No. 30 Lv. Idaho Falls 1:10 AM
            Ar. Pocatello   2:40 AM
Train No. 34 Lv. Idaho Falls 3:25 PM
            Ar. Pocatello   4:55 PM"

Trains 45 and 46 connect at Idaho Falls with Trains 33 and 34, respectively, all of which trains carry passengers, baggage, express, mail and newspapers, serving all intermediate points and paralleling U. S. Highways 91 and 191.

It further appears the Teton Stage Line operates a schedule each way per day between Sugar City, Idaho, and Idaho Falls, Idaho, as follows:

"Southbound
        Lvs. Sugar City 10:40 AM
        Arr. Idaho Falls 11:45 AM
Northbound
        Lvs. Idaho Falls  5:00 PM
        Arr. Sugar City  6:00 PM"

In addition there are two airplane express companies operating between Pocatello and Idaho Falls.

At the hearing Mrs. M. L. Wirt, Glenn A. Harvey, Duan Seeley, Stanley Clark and LaVon F. Merrill testified in behalf of applicant in support of the application. Mrs. Wirt testified on direct examination that she rode the Union Pacific bus from Shelley to Idaho Falls about once a month; that Christmas morning 1946 the bus failed to pick her up when she was a short distance from the bus depot; that she waited and some one came along and gave her a ride; that sometimes the buses were crowded; that she believed she would be benefited by the proposed schedule; for that reason she wished additional bus service. On cross-examination she testified that the proposed Nichols schedule would not have assisted her on the Christmas morning she testified about; that she thought schedules should be arranged to meet the requirements of the general public; that if she went to Idaho Falls and wanted to return to Shelley the same day, she wouldn't be able to return on the Nichols bus because it wouldn't be coming back until the next morning.

Glenn A. Harvey testified on direct examination he lived at Basalt about fifteen miles south of Idaho Falls; that he daily traveled from Basalt to Idaho Falls; that he went up in the morning and returned home at night; that he had been working in Idaho Falls since May 15, 1947; that

the morning bus between Shelley and Idaho Falls was crowded every day so he had to stand up unless there was a second section; that second sections were occasionally operated; that he couldn't use the proposed Nichols service if it were established. On cross-examination he testified the proposed Nichols service would not remedy the situation; that at Idaho Falls the "buses are very well crowded during the working hours, going to and returning from" Idaho Falls.

Duan Seeley testified on direct examination he lived at Chester, Idaho, and worked as a bank teller at St. Anthony, six miles distant; that he rode the Union Pacific bus; that he left Chester at 7:12 mornings and arrived in St. Anthony at 7:20 or 7:25; that he had to wait from 7:25 'till 9 o'clock; that the time he left the bank varied; that it was from 4:00 to 6 o'clock and that going home he generally rode the 6 o'clock Union Pacific bus; that usually he would have to wait an hour; that the proposed Nichols schedule would be much better; that he would use that service if it were established; that he did not know how many others were situated as he was at Chester—"a couple anyway". On cross-examination he testified the two who got on at Chester went to Rexburg and one to St. Anthony; that whether he lost two and one-half hours a day six days a week depended upon when he got out of the bank; that the more buses the better it would suit him; that it was just personal with him.

Stanley Clark testified on direct examination he lived on a farm four and one-half miles from Ashton; that when his daughter was going to school last year (1946) she traveled by bus every day; that in the winter he traveled by bus quite a bit; that his daughter attended Ricks College; that she left (Ashton) at 6:45 mornings and arrived at Rexburg at about 7:30; that her first class was at 8 o'clock; that he rode the bus to Arizona and back twice a couple of years before the hearing; that he had gone to Salt Lake and Logan several times; that he went to Pocatello occasionally to see a brother; that when going to Pocatello he usually took a bus; that when he went to Pocatello he had to get up about 4 o'clock in the morning; that a later schedule would be more convenient for him; that if there was an earlier schedule he would use it a part of the time; that for a return trip the proposed Nichols schedule would suit his individual needs and the needs of his family better than the Greyhound service; that there were several students who traveled by bus to Rexburg; that he and his family would use the proposed schedule if it were established.

On cross-examination Clark testified that his daughter was not then going to college; that he had a son who would be going after Christmas; that Ricks College had some classes as early as 8 o'clock; that the proposed Nichols schedule would not put Ashton students into Rexburg in time for the 8 o'clock classes; that he could

not (would not have time to) transact any business of any consequence if he used the proposed schedule; that in the winter he would average a dozen trips to Idaho Falls or Pocatello; that in the summertime he didn't use the bus very much, that he used his own car.

LaVon F. Merrill testified on direct examination he was secretary of the Auto Parts Company in business in Idaho Falls; that the business of that company was selling auto parts, principally wholesale; that the territory covered was "From Pocatello on the south, over into Wyoming, up in the Driggs section, over in that way, and over in Salmon, and up into West Yellowstone"; that auto parts were transported by railroad, bus, parcels post, truck lines, and express; that sometimes there were several express shipments a day; that shipments were made by Union Pacific Stages; that sometimes the service was good, but sometimes "it hasn't been anything to brag about"; that most of the difficulty of making shipments by express arose out of not being able to get them on the bus, because of a deadline; that he thought the deadline was an hour before a bus left; that sometimes there were telephone calls, but that during the deadline hour they could not get the shipments on the bus; that the service of Union Pacific Stages had not been all together satisfactory; that another bus service would benefit them "because we have shipments going out at all hours during the day, and the more bus service we

can have the better off by far we will be, especially on our C.O.D.'s"; that since the spring of 1947 Union Pacific Stages would not accept C.O.D. shipments; that if the Nichols service was established his company would use it.

On cross-examination Merrill testified that the schedules mostly used were around 4:30 afternoons going North; that the proposed schedule leaving Idaho Falls at 3:30 p. m. wouldn't catch any shipments after that time; that Union Pacific schedule at 4:45 would just about take care of all shipments north from one p. m., "unless we got telephone calls after 3:30"; that they had quite a few shipments going out mornings in both directions; that he did not know what morning schedules they could ship on going south; that he knew there were buses going south but didn't know the time.

▮ That brings us to the consideration of the requirements of sec. 59-804, I.C.A. So far as pertinent here that section provides: [Sec. 59-804] "Upon the filing of said application the commission shall consider the same, and if it shall appear that the applicant is responsible and is capable of furnishing adequate, safe and proper service as an auto transportation company, operating as a common carrier, as the term is defined in this chapter, said application may be granted and the commission may issue a permit as prayed for *upon good cause shown.* * * *" (Emphasis added.)

In considering the above quoted section we direct attention to Malone et al. v. Van Etten et al., 67 Idaho 294, 178 P.2d 382. In that case it appears Edward Van Etten became the owner of and operated what was known as Nock Transportation Company, a common carrier, July 1, 1944; that in the latter part of April, 1946, Van Etten ceased operating between Boise and Stibnite; that appellant Malone filed an application for permit as a common carrier May 10, 1946, to operate between Boise and Stibnite; that on the hearing of the Malone application it was shown, and we quote, Id., 67 Idaho at page 300, 178 P.2d at page 385: "The record discloses that when the application was made Van Etten had abandoned his service as a common carrier between Boise and Stibnite; that Stibnite is located in an isolated section of the state; that the operation of motor transportation from Cascade to Stibnite, by reason of mountainous roads, is difficult; that the village of Stibnite has a population of approximately 800 people; that it has but one mercantile company supplying the inhabitants of the village and territory adjacent thereto; that it is necessary that they procure fresh fruits, vegetables, meats and other necessities; that the delay in delivering such necessities resulted in meat, milk and vegetables becoming so deteriorated as to be unfit for human consumption. The record also discloses that while Van Etten was operating numerous complaints were made due to his failure to deliver at Stibnite the necessities required by the inhabitants, and his failure to deliver to the Bradley mines materials necessary for their operations; that in order to secure the delivery of supplies to that section of the state private contracts were entered into with the applicant by" certain companies and individuals.

Notwithstanding the record showed Stibnite had a population of 800 people; that the village was located in an isolated section of the state; that it was necessary the people have fresh fruits, vegetables, meats and other necessities; that the delay in delivery resulted in meat, milk and vegetables becoming unfit for human consumption, and, finally, and notwithstanding the fact that Van Etten, the common carrier serving Stibnite, had abandoned service between Stibnite and Boise, the commission denied the Malone application. That, of course, squarely presented the question as to whether the commission was under any duty to consider the public interests, and surrounding relevant facts and circumstances, in determining whether good cause had been shown, concerning which this court pointed out the commission "are required to consider the interest of the public, their needs and necessities and location and, in fact, all the surrounding facts and circumstances, and then determine whether good cause has been shown and the public interest requires that a permit issue, to the end that the public be *adequately* served [emphasis added]."

We then further pointed out it had been "abundantly established that the public interest required applicant's services as a common carrier; that good cause was shown for the issuance of the permit, and that the Commission erred in denying the same."

In the case at bar the evidence in support of respondent's application, boiled down, is extremely meager and vague at best. For instance, Mrs. Wirt did not testify to any public need or necessity for additional service. She testified she believed she would be benefited by the proposed schedule and for that reason she "wished" additional bus service. Harvey testified the morning bus between Shelley and Idaho Falls was crowded every day so he had to stand up unless there was a second section, but further testified the proposed Nichols service would not remedy that situation and, further, that he couldn't use the Nichols service if it were established.

Seeley testified respondent's proposed service would be much better for him and that he would use it if it were established. Clark testified that a later schedule out of Ashton would be more convenient for him, but that if there was an earlier schedule he would use it also a part of the time, and that for return trips respondent's schedule would suit his individual needs and the needs of his family better than the Greyhound service. While there is a suggestion in respondent's evidence there were several Ricks College students who would use respondent's proposed service, not a single student or any member of the Ricks College faculty testified there was any Ricks College student need for respondent's proposed service, notwithstanding Ricks College is located but a short distance from Idaho Falls where the hearing was had.

Merrill's testimony covered the matter of express service out of Idaho Falls only. He testified sometimes it was good and other times "it hasn't been anything to brag about". Again it was a matter of personal benefit and convenience and not a matter of public need.

It must be conceded testimony respondent's proposed service would suit the personal convenience of four or five persons over a proposed route extending from Ashton to Pocatello, does not establish the existence of a *public* need or *public* necessity, in other words, does not establish good cause within the meaning of sec. 59-804, supra, for the proposed service. And, further, it is at once clear the showing made by respondent here is not comparable to the showing made by Malone in Malone v. Van Etten, supra. And it is also clear the evidence is insufficient to support the findings of the commission upon which it based its order granting a permit to respondent.

This court held in Oregon Short Line Railroad Company v. Public Utilities Commission, 47 Idaho 482, 484, 276 P. 970, 971: " 'An order based upon a finding made without evidence * * * or upon a finding made upon evidence which clearly does not support it * * * is an arbi-

trary act against which courts afford relief.' " Cited and approved in the recent case of Taylor v. Union Pacific R. Co., 60 Idaho 185, 89 P.2d 1005.

Moreover, a number of witnesses were called by Union Pacific Stages in support of its protest to the granting of respondent's application, the protest being based upon the ground, among others, that the territory sought to be served by applicant between Ashton and Pocatello, Idaho, over U. S. Highways 91 and 191, was being and for a long time had been adequately and sufficiently served by Union Pacific Stages and other transportation agencies. The testimony of protestant's witnesses was to the effect that the territory covered by respondent's proposed schedule was being, and had been, adequately and sufficiently served, and the commission found upon ample evidence that "Protestant Union Pacific Stages has at all times furnished adequate, safe and proper service upon and over this route," and, further, that "Competition now serves the immediate public interest."

The orders appealed from are reversed and the cause remanded to the commission. Costs awarded to appellant.

HYATT, J., and BAKER, Dist. J., concur.

TAYLOR, District Judge (dissenting).

By the elimination from the auto transportation act of the requirement for a showing of public convenience and necessity in the 1929 enactment, it appears that the legislature intended to vest wide discretion in the Commission. The legislature has concerned itself more with the responsibility of the applicant and his capability "of furnishing adequate, safe and proper service", leaving the Commission the determination of what constitutes "good cause shown".

The Commission has found, and the protestants do not challenge the finding, that the applicant is responsible and capable, and has qualified under the law. The Commission has also found that "There is sufficient present traffic on the line proposed to be served by applicant to enable applicant to furnish the service without presently effecting a substitution of the new carrier for the present permit holders. * * * The economic facts of life in the area sought to be served under the application indicate that additional service will serve the public interest in their presently existing needs and necessities and that in the present circumstances, the permit sought herein can be granted without deleteriously affecting the service now being performed under permits now outstanding over the same route."

On this and related aspects of the question of "good cause" the evidence is conflicting. But it is sufficient to support the findings.

In another finding the Commission expresses a fear that future adverse economic conditions may render the competitive ser-

'vice offered by applicant adverse to the public interest. This is another question addressed to the discretion of the Commission. A consideration of the entire auto transportation act indicates that the Commission has an abundance of information in its files in the reports required of carriers operating over the proposed route, which it must take into consideration, in addition to the evidence offered on the hearing. Were it not so, section 59-804, I. C. A., would not have specifically forbidden the Commission to deny an application without a hearing, while inferentially permitting it to grant an application without a hearing.

The record does not show that the Commission has abused its discretion or violated any right of appellants. Its findings are supported by substantial evidence. The orders appealed from should be sustained.

MILLER, J., sat at the hearing but did not participate in the decision.