289 P.2d 933

Applications of **INTERMOUNTAIN GAS COMPANY, Pocatello Natural Gas, Inc., Idaho Natural Gas Company, for a Certificate of Convenience and Necessity.**

No. 8314.

Supreme Court of Idaho.

Oct. 28, 1955.

As Modified on Denial of Rehearings Nov. 29, 1955.

Graydon W. Smith, Atty. Gen., Kenneth G. Bergquist, Asst. Atty. Gen., for Idaho Public Utilities Comm.

Hawley & Marcus, Langroise & Sullivan, Boise, for appellant Intermountain Gas Co.

J. L. Eberle and W. D. Eberle, Boise, Q. P. Dorschel, Chicago, Ill., for respondent Idaho Nat. Gas Co.

TAYLOR, Chief Justice.

A hearing was had before the Idaho Public Utilities Commission, beginning October 27, 1954, on the applications of Intermountain Gas Company (appellant) and of Idaho Natural Gas Company (respondent), rival

applicants for a certificate of convenience and necessity for the distribution of natural gas within certain counties in the southern part of the state. There were other applicants, intervenors and contestants in the proceedings who have taken no appeal and are not now involved. February 2, 1955, the commission entered its order No. 3041 granting the application of, and issuing certificate of convenience and necessity to, Idaho Natural Gas Company, respondent, and denying the application of appellant and others. March 10, 1955, the commission entered its order denying a rehearing. The Intermountain Gas Company brought this appeal from those orders.

## Plan and Organization

From its showing before the commission it appears appellant was incorporated under the laws of Idaho October 12, 1950. All of its officers and directors are residents of the state of Idaho, except its vice-president and manager. Appellant's application for a certificate of convenience and necessity was filed October 21, 1950. Appellant began the preparation of its proposal in 1952. It became active in support of the application of Pacific Northwest Pipeline Corporation, before the Federal Power Commission for authorization to construct a pipeline from fields in New Mexico, Colorado and Wyoming through southern Idaho and into the Pacific Northwest.

Appellant employed H. Zinder and Associates, Inc., of Washington, D. C., a qualified company, to determine the economic feasibility of its proposed distribution system. It also employed Fish Service and Management Corporation, of Houston, Texas, recognized experts and specialists in the engineering of gas distribution systems, to lay out and prepare plans for its proposed system. Appellant expended considerable sums of money in preparing to qualify for certification by the commission. Mr. C. A. Brandt, of H. Zinder and Associates, a rate engineer, worked on appellant's proposal from June, 1954, to the time of the hearing. Mr. K. E. Graff of the Fish Service and Management Corporation, a qualified expert in designing, engineering, installing and inspecting of natural gas distribution systems, worked on the appellant's project from November, 1953, to the time of hearing. Mr. K. W. Spencer, of H. Zinder and Associates, an engineer of qualified experience in the gas distribution industry, worked on appellant's proposal from January, 1954, to the time of hearing. Mr. H. H. Ross, of Houston, Texas, also an engineer qualified in gas distribution industry, employed by the Fish organization, worked on the appellant's proposal for several months. After coming to Idaho Mr. Ross was elected vice-president and general manager of appellant.

These experts spent months traveling about the state and into the communities covered by appellant's application; also in surveying and mapping the proposed distribution system and canvassing local offi-

cials, citizens and industries in the proposed market areas.

Appellant also procured the services of White, Weld & Co., New York City, an investment banking firm, organized in 1896, with offices in several cities in the United States and in some foreign countries. That firm specializes in the financing of corporations entering or engaged in transmission and distribution of natural gas. Mr. H. L. Remmel, a partner in the firm, testified that his firm had been working with appellant from June, 1953, assisting in the preparation of its proposal and the determination of its financial and economic feasibility; also that his firm has approved the plan and agreed to place the first mortgage bonds and underwrite the debentures involved.

Through the efforts of its officers and the aforementioned experts, the appellant presented to the commission a complete plan and proposal for the construction and operation of a gas distribution system in the territory it proposes to serve. It also furnished a statement of its organization; its articles of incorporation; a list with a biographical sketch of each of its officers and directors; a list of its stockholders, and a financial statement. It also filed a complete list of subscribers to its common stock, all residents of Idaho, showing a total subscription of approximately eighty-five to ninety percent of its requirements. Appellant properly calls attention to the fact that it is and proposes to remain a locally owned and locally controlled corporation. This showing is to the effect that all or practically all of the voting stock of the corporation will be held by residents of the state. Beside the economic advantage to the state involved in such ownership, local control of the corporation would facilitate future regulation and control by the commission. State Corporation Commission v. Mountain States Tel. & Tel. Co., 58 N.M. 260, 270 P.2d 685, 698–700. On this score respondent merely proposes that it will make a public offering of its common stock in Idaho. Respondent's present and future ownership and control was not revealed to the commission, the record showing only that qualifying shares have been issued to its officers and directors, the principals of whom are non-residents of this state.

Appellant's plan provides for an investment during the construction period of approximately $8,000,000, and for the laying of approximately 1,428,700 feet of distribution lines. It has attached maps of municipalities to be served showing the location of distribution lines and their related facilities. These maps show that appellant's plan calls for an initial laying of service lines in the "core" or central areas of each community, of such dimensions and so laid out that they can be extended outward to include outlying areas when and if the demand arises, and additional gas becomes available.

194

June 18, 1954, the Federal Power Commission issued its decision authorizing Pacific Northwest Pipeline Corporation to build and operate the pipeline hereinbefore referred to. Based upon market estimates and the capacity of the pipeline authorized by it, the FPC approved the allocation of 33,149 Mcf of peak day gas for distribution in Idaho.

Respondent was incorporated July 14, 1954, and filed its application with the commission July 22, 1954. This company produced to the commission its articles of incorporation. It did not exhibit a financial statement nor a statement of its organization, officers directors or stockholders.

Respondent employed Stone & Webster Service Corporation, of New York, a corporation specializing in engineering service to corporations engaged in or entering gas, electrical or other utility enterprises. Mr. George W. Carpenter, of New York, an engineer employed by Stone & Webster to make a field survey for that organization, accompanied by "a fellow engineer", spent ten days in Idaho visiting the municipalities to be served. They procured aerial photographs made by the Department of Agriculture, and maps and outlined on these the area in each community to be served. Because of limited time available, their contacts with residents, local officials and industries were limited. They did not make a canvass of the potential commercial and industrial customers nor attempt to determine the public acceptance of gas. The information they gathered from these visits, together with other information and data, collected by the organization, was compiled and examined in the offices of Stone & Webster, and a plan and proposal was submitted by that organization in support of respondent's application. Mr. Carpenter was the only expert witness of respondent who testified concerning the engineering phases of its case.

Respondent also procured the services of Central Republic Co., a corporation of Chicago, Illinois, which specializes in the underwriting of debt and equity securities. This company, in collaboration with Stone & Webster, prepared and approved the financial features of respondent's proposal. Mr. E. K. Hays, a vice-president and director of Central Republic, appeared and testified in support of respondent's application. The proposal contemplates a capital investment during the construction period of approximately $16,000,000, and the laying of 2,888,000 feet of distribution lines. The maps and other data submitted indicate that respondent's plan calls for the initial laying of service pipes in all of the "built up" area in each community. The plan does not contemplate any house to house canvass to determine whether there will be customers available on the streets and alleys proposed to be piped. Mr. Carpenter testified that the plan to pipe the entire area immediately was adopted because "the system can be constructed considerably cheaper by building it all at once." ...

The other experts were of the opinion that the safer and more prudent way is to lay service pipe in the older center of each community where older and established businesses and residences are located. These are more likely to convert to gas than are prospective customers in newer districts who would be reluctant to scrap relatively new electric, oil, or coal burning equipment. After a balanced load of industrial, commercial, and residential customers is acquired, then the system can be expanded safely to the other districts as demand arises and gas becomes available.

There was also expert opinion that it is not cheaper initially to pipe the entire area to be served. Mr. Carpenter's conclusion necessarily anticipates future costs, which is not a proper basis for rate making. Public utilities are not permitted to include anticipatory capital expenditures in their rate base. It is only when the property is actually placed in the public service that its inclusion is allowed. In re Mountain States Tel. & Tel. Co., 76 Idaho 474, 284 P.2d 681. The commission would be faced with the difficult task of separating that part of respondent's plant actually being used in the public service from that part thereof not in use, particularly during the years it would take to develop the business to the point where all of the initial installation would be put in use. This also anticipates an unlimited supply of gas.

Originally, respondent's articles of incorporation authorized the board of directors to sell and dispose of the entire assets of the corporation without a vote of the shareholders. When the commission's attention was called to this, respondent amended its articles so as to require a vote of the shareholders. However, this was not done until after the commission had given its decision to respondent. Appellant points out that article XI of respondent's articles, permits its directors to be pecuniarily interested in contracts with the corporation and to participate and vote upon the authorization of such contracts. This is of questionable sanction under Idaho law. § 30–142, I.C.; Melgard v. Moscow Idaho Seed Co., 73 Idaho 265, 251 P.2d 546.

Rates

Appellant submitted a complete schedule of proposed rates (Exh. 20). Respondent submitted no such schedule, but in its showing (Exh. 1, page 10) listed certain rates upon which its operating revenues were calculated. It appears from these rate proposals that for the small domestic consumer, using gas for cooking, water heating, refrigeration, driers, and fire places, appellant's rates are lower than those proposed by respondent. Appellant's rates for domestic space heating are a little higher than those proposed by respondent, a difference of eight to ten dollars more per year per customer, on the basis of consumption as estimated by appellant. On the basis of domestic consumption as estimated by respondent the householder's annual bill would be about $45 more than as esti-

mated by appellant, and about $32 more than as estimated by Pocatello Natural Gas, Inc.

For interruptible gas to industrial customers, appellant's rate is 35¢ per Mcf; respondent's 40¢ per Mcf. Appellant's rates for firm, commercial and industrial service on increased volumes are as low as 45¢ per Mcf. Respondent's lowest rate for firm gas to such users is 90¢ per Mcf.

It is apparent from these rate proposals that appellant's proposal would result in a larger consumption by commercial and industrial consumers, both firm and interruptible, in proportion to the domestic consumption of firm gas; whereas respondent's proposal would tend to overload the system with firm domestic demand and minimize commercial and industrial consumption. Those industries which might be induced to use gas on an interruptible basis because of the lower rate offered by appellant, might be eliminated by respondent's non-competitive higher rate.

The experts who appeared before the commission testified, without contradiction, that a well balanced system requires a market for a large volume of commercial and industrial gas, in order to make the project financially sound and to enable it to supply gas for domestic consumption at a reasonable rate. Respondent's plan emphasizes domestic consumption and results in a disproportionate volume of available supply devoted to that use. The result is an overload of firm, domestic, seasonal space heating consumption, without sufficient interruptible gas with which to meet peak day firm demand. This would result in exceeding the available supply on peak days. Respondent proposes to meet that situation by installation of "peak shaving" facilities; to make up the shortage with manufactured gas. Such facilities, in turn, require a capital investment of $650,000.

Mr. Carpenter, respondent's expert, testified, on cross-examination, concerning methods of meeting peak day demand, as follows:

"Q. Now what, in your opinion, would be the effect of the sale of interruptible gas, your interruptible industrial gas, to accomplish that?

"A. That is a very good way to do it.

"Q. And that is an excellent way to do it, particularly in a new system which is just starting out, isn't it?

"A. That is correct."

Thus, inferentially, he approves appellant's plan in that respect.

The soundness of respondent's plan was directly challenged by the experts appearing for appellant, and by the expert, W. H. Nix, who testified for the applicant Pocatello Natural Gas, Inc. In substance they testified that the plan to lay pipe initially in all of the built up areas of each community is not sound; that the accepted method is to begin service in the central, older, built up and established core of the

community and then expand into the outer areas as demand develops and gas becomes available.

Respondent's estimate for initial construction in the Pocatello area is $821,900, compared to Pocatello Natural Gas, Inc. estimate of $801,000 and appellant's estimate of $804,000. Respondent proposed to lay some 12,100 feet less pipe than the Pocatello company. Referring to this, Mr. Nix testified that respondent's expenditure would not make gas available to the number of customers as claimed by respondent, and stated that his own estimates would supply service to approximately only 75% of his anticipated fifth year customers. Other inaccuracies were admitted by respondent's witness Carpenter. This evidence seriously questions the accuracy of respondent's calculations and its claim that it would by its initial installation make gas available to 95% of potential users in its service areas.

Respondent's higher rates for industrial and commercial consumers and its possible loss of that business, the commission considered not of much importance, "in view of the readiness of all applicants to review and adjust downward proposed rates to very large industrial customers for interruptible gas service so as to compete with other fuel costs." The error in that reasoning is, it fails to recognize that respondent could not adjust downward its capital investment if it had already committed the available supply of gas to other consumers, or had laid its pipes along streets and alleys where there is little or no demand for gas. The simple fact is, if respondent were compelled to reduce its rates to attract industrial and commercial consumption, it must at the same time increase its rates to domestic users. Confronted with this situation and having special reference to the available gas supply, respondent's expert witness testified that its plan could be made feasible by reducing domestic heating business "more than slightly" and then charging the higher rates proposed by appellant. Further cross-examined on this point, Mr. Carpenter testified:

"Q. Do you think that you could build a plant of some 16 or 18 million dollars and distribute the 33,149 gas through it and make it pay?

"A. It will pay on Intermountain's rates—yes.

"Q. You are talking about their industrial rates, are you, Mr. Carpenter?

"A. No—retail.

"Q. You think it would pay off on 18 million dollar investment?

"A. Yes, sir.

"Q. Do you think you could make it pay on your proposed rates?

"A. Well, no it wouldn't pay on those rates."

Thus respondent admits that to make its proposal feasible or financially sound, it

must have either an unlimited supply of gas, or higher rates.

Domestic space heating cannot be curtailed in the winter peak season, once the connection has been made and gas heating equipment installed. Home owners cannot be expected to maintain standby equipment for heating.

The plans of the two applicants also differ in their estimates of the volume of domestic consumption. Respondent based its plan and financing upon an estimated consumption of 25 cubic feet per degree day, or 160 Mcf per year per customer for domestic use. Appellant's plan is based upon an estimated consumption per customer of 15 cubic feet per degree day. The Pocatello Natural Gas Inc., estimated such consumption in Pocatello at 18 cubic feet per degree day and in the smaller outlying communities in that area at 15 cubic feet per degree day. The great weight of expert opinion, and experience in other states, is to the effect that respondent bases its financial plan upon an over-estimated rate of domestic consumption. If its anticipated sales did not materialize, it would have to increase its rates in order to pay a return on its proposed investment. If its estimate proved to be correct, the plan would still be faulty in the absence of an unlimited supply of gas. On the other side, if appellant's estimate proved to be too low and gas became available, it could then supply such consumers at a still lower rate.

## Availability of Gas

The allocation for the Idaho market from the forthcoming pipeline now stands at 33,149 Mcf of peak day gas. There is within the capacity of the pipeline 15,000 Mcf of gas unallocated. To get a further allocation it is necessary to make application to the Federal Power Commission and to support the application at a hearing before that body. The witnesses for the parties stated and admitted that there would be a spirited contest between customers in Idaho and others elsewhere for the unallocated gas. Prospects are that additional gas will be available in the future as new fields are opened up and new sources developed, or additional supplies made available from existing reserves. All parties expressed the hope and expectation that such additional gas will in the future become available to the markets of the northwest. But for the present and for the purpose of determining the issues presented to the commission, and now before this court, it must be considered that there is a limit to the amount of gas available for consumption in this state, and that such limit is the amount presently allocated. To plan and construct a distribution system, in a new and unproven market area, upon the basis of an unlimited supply of gas, is highly speculative and dangerous, not only to those who propose to make the installation, but also to the consumers who invest in appliances and equipment and who must pay the rates necessary to maintain such system. . .

' Referring to the importance of the showing of an adequate gas supply in certificate proceedings, the Federal Power Commission recognized the controlling nature of that issue when it said: "An adequate gas supply is the bedrock upon which such findings must be grounded." In re Northern Natural Gas Company, 94 P.U.R. (N.S.) 485, at 499.

Appellant's plan contemplates a supply of 36,168 Mcf, some 10% above the present allocation. However, as pointed out by Mr. Remmel and Mr. Ross, by shifting the load from interruptible to firm customers, appellant could meet the peak day demands, even though the 10% additional gas does not become available. The conclusion is without dispute in the record that appellant's plan is financially and economically sound and feasible within the known gas supply.

Respondent's plan is based upon an estimated contract demand of 41,669 Mcf for the first and second years; 55,940 Mcf for the third year; 67,940 Mcf the fourth year, and 80,150 Mcf the fifth year. While its estimated peak day sales would be within the available gas supply the first year, its estimated residential sales alone for the second year exceed that supply. Its total sales for the second year are estimated at 45,014 Mcf; 63,608 Mcf for the third year; 80,041 Mcf for the fourth year; and 95,443 Mcf for the fifth year. While some of this peak day excess may be provided by the proposed "peak shaving" supply, it is apparent that basically respondent must rely and does rely upon a supply of natural gas far in excess of the amount presently available. It is obvious, and it is admitted, that manufactured gas cannot, because of its cost ($2 per Mcf), become an important source of supply for any distributor, but can be economically used only for "peak shaving" purposes. It thus becomes apparent that respondent's plan is unsound and unworkable when related to the presently available gas supply.

Indeed, Mr. Carpenter, respondent's expert, admitted that its plan would fail if limited to the present allocation, but contended that respondent could successfully operate on the supply of 36,168 Mcf, set out in appellant's proposal, by adopting appellant's higher rates. In view of other of respondent's miscalculations herein pointed out, and its overextended capital investment, that conclusion is questionable. However, assuming it to be true, it must then be accepted as beyond question that appellant could provide the service at a still lower rate, because of its lower capital investment.

The commission cannot speculate, nor join the respondent in speculating, upon the future availability of gas, but must confine its determinations to facts susceptible of demonstration within reasonable limits. If the commission in these proceedings gives its approval to the laying of pipe for which there may be no gas, or for which the supply may be insufficient to make a

profitable return on the investment, does it not thereby commit itself in advance to allow such capital expenditures to be included in the rate base and to authorize the imposition of excessive rates to provide a return thereon?

"The Commission has a duty to prevent, so far as lies within its legal powers, investments in service facilities in excess of those actually needed for adequate service." Wisconsin Commission in Re Dahlberg Light & Power Company, 16 P.U.R.(N.S.) 530.

■ Respondent's plan appears to have been hastily prepared and ill considered; and it was admitted by its experts to be unworkable within the present gas supply. Its approval by the commission thus rests upon speculation as to future possibilities. In giving its approval to such a proposal, when another proposal was before it, which is admittedly sound and feasible, the commission has not regularly pursued its authority.

### Bingham and Bonneville Lateral

Appellant also assigns as error the action of the commission in finding that the extension of service to the municipalities in Bingham and Bonneville Counties is not feasible at this time, and the action of the commission in nevertheless including those municipalities in the exclusive certificate granted respondent. Appellant is the only applicant which proposes to extend service to these cities. The only

substantial evidence in the record as to the financial feasibility of that extension is that offered by appellant; and such is to the effect that gas sales through that extension would provide a reasonable return upon the investment. The Pocatello company did not propose such extension, chiefly because it was interested only in Pocatello and other smaller nearby municipalities lying along the pipeline route. Such adjacent municipalities would provide the distributor with the cheapest and most profitable market. Respondent's expert witness, Mr. Carpenter, claiming to have made only a preliminary study of the feasibility of such extension, testified that he did not consider it economically feasible at this time. Whatever his study may have been, it apparently concerned an extension from Pocatello to Ashton, a distance of approximately 105 miles. The value of his opinion becomes self-apparent from a subsequent answer to a question by his counsel.

"Q. Would it be possible to make a shorter lateral than to project one all the way up to Ashton?

"A. It would be possible to make the extension—I am not prepared to answer the feasibility part of it; however, it seems to me that a line halfway would be no more feasible than a line extending all the way to Ashton, and I believe there would be an obligation to extend it all the way."

The distance between Pocatello and Idaho Falls is approximately fifty miles. A

fifty mile extension would serve Blackfoot, Firth, Shelley and Idaho Falls. The combined population of these communities is more than twice the combined population of the municipalities lying beyond Idaho Falls, in the additional 55 miles necessary to reach Ashton. To say that an extension to Idaho Falls is no more feasible than a line all the way to Ashton, is an error apparent to laymen, and a misstatement which weakens the testimony of an engineer.

 It hardly need be said that if at all feasible such an important area of the state should not be denied its share of presently available gas. There being an applicant before the commission proposing to render such service, and its plan appearing feasible, it should have been given the commission's approval. Should its operation prove a burden upon other communities, the commission would have authority to require a self-supporting operation of that line, as a unit, or its discontinuance. In any event, the commission did not regularly pursue its authority when it granted an exclusive certification to respondent covering those communities which respondent says it will not serve.

Respondent urges that the commission's order directs respondent to make and submit detailed studies of the area north of Pocatello. This cannot justify the inclusion of that area in the present certification. The fact that studies are to be made by a company hostile to that service, cannot be a source of satisfaction to those communities. Nor is such a study a reliable source of information upon which to base future action by the commission. In the meantime, the exclusive certification of that area to respondent would discourage studies by independent concerns and by the communities themselves. Also, in view of the unrealistic load factors involved in respondent's plan and the firm commitments exceeding the available gas supply, it is but reasonable to conclude that respondent in all likelihood would never find it feasible to serve that area.

 The order entered by the commission discloses that all the cities or communities included in appellant's plan are also included in respondent's plan with the exception of the cities of Idaho Falls, Shelley and Blackfoot, while respondent proposes to serve the communities of Emmett, Fruitland, Glenns Ferry, Inkom, Lava Hot Springs, Filer, Georgetown, Kimberly, New Plymouth, and Parma, which are not included in appellant's plan. Several of these communities are on or within close proximity to the pipeline of Pacific Northwest Pipeline Company, and it appears that they, or at least several of them, should have gas available for their use should they so desire. The commission should require the successful applicant to render service to these communities wherever economically feasible, or allow such communities to provide their own service.

202

We recognize that the Public Utilities Commission is a fact finding and administrative body, exercising great discretionary powers, and that this court's review of its orders is limited. Const. Art. 5, § 9; § 61–629, I.C.; State ex rel. Taylor v. Union Pac. R. Co., 60 Idaho 185, 89 P.2d 1005; In re Mountain States Tel. & Tel. Co., 76 Idaho 474, 284 P.2d 681. However, embraced within that review and within the determination of the question as to whether it has regularly pursued its authority, the findings of the commission must be based upon substantial evidence; its findings not thus supported, or which are contrary to the evidence, cannot be accepted by the court as a basis for upholding the conclusions of the commission. Const. Art. 2, § 1; Idaho Power & Light Co. v. Blomquist, 26 Idaho 222, 141 P. 1083; Nez Perce Roller Mills of Lewiston v. Public Utilities Comm., 54 Idaho 696, 34 P.2d 972; Mountain View Rural Tel. Co. v. Interstate Tel. Co., 55 Idaho 514, 46 P.2d 723; State ex rel. Taylor v. Union Pac. R. Co., 60 Idaho 185, 89 P.2d 1005; Application of Nichols, 68 Idaho 490, 199 P.2d 255; Application of Lewiston Grain Growers, 69 Idaho 374, 207 P.2d 1028; Application of Pacific Tel. & Tel. Co., 71 Idaho 476, 233 P.2d 1024.

"'An order based upon a finding made without evidence, (The Chicago Junction Case, 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667), or upon a finding made upon evidence which clearly does not support it (Interstate Commerce Commission v. Union Pac. R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308), is an arbitrary act against which courts afford relief.' Northern Pac. R. Co. v. Department of Public Works, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. [836] 837." Oregon Short Line R. Co. v. Public Utilities Comm., 47 Idaho 482, at page 484, 276 P. 970, at page 971.

Respondent's plan being shown to be unsound, and the commission having before it an applicant whose plan is demonstrated to be sound, backed by ample financial support and technical and managerial skill, and proposing to distribute available gas to the widest possible areas, without over-investment, and with facilities capable of expansion as gas and markets become available, the commission, in the regular pursuit of its authority, should have approved appellant's application and issued to it the requested certificate.

The primary consideration here is not the interest of any of the applicants, but is the rights and interest of the people of the state of Idaho. The question as to which applicant should receive the certificate should be determined in the interest of the general public. Application of Trans-Northwest Gas, Inc., 72 Idaho 215, 221, 238 P.2d 1141.

The order granting certificate to respondent, and the order denying a rehear-

ing, are set aside, and the cause is remanded to the commission for further proceedings in the premises, and in conformity with this opinion.

Costs to appellant.

PORTER and SMITH, JJ., concur.

On Petitions for Rehearing.

The petitions for rehearing of the commission and respondent are supported by excellent and able briefs. Errors pointed out, we have corrected in the foregoing opinion.

In summary, respondents urge that this court erred in considering the assignments and issues presented by appellant, for the reason that the court had no jurisdiction to do so. Respondent Idaho Natural Gas Company contends that the function of the commission in certification proceedings is purely administrative, and distinguishes between the scope of review in such proceedings and proceedings involving constitutional rights where the commission exercises a judicial or quasi-judicial function, such as in rate cases; and urges that in administrative proceedings the legislature has invested complete discretionary power in the commission, and that there is no room for judicial intervention. In its brief, respondent says:

"No constitutional question is here involved; in fact, no question of law is involved. * * *; however, it is not only clear that certification or any permissive right is purely administrative but that there is not involved any judicial function."

To be consistent with this view, respondent should have moved to dismiss the appeal on the ground there was nothing presented which the court had jurisdiction to review. On the contrary, respondent briefed and argued the issues presented by appellant.

Assuming (but not deciding) the distinction is a proper one and that the function of the commission in this case is purely administrative, respondent's conclusion is not warranted. The constitution provides this court with jurisdiction to review "any order of the public utilities commission." Art. 5, § 9. The statute likewise provides for an appeal "from any order" of the commission. § 61–627, I.C. True, the legislature has limited the scope of the appeal. § 61–629, I.C.

We have reviewed the evidence and the record in this case only to the extent necessary to determine the ultimate question as to whether the commission regularly pursued its authority. The conclusion that the commission's orders should be set aside is not based upon weight of evidence or creditability of witnesses, nor is it based upon "the size of the pipe, the number of feet of pipe, the number of customers it may attach, rates to be charged, the amount of consumption of gas per customer, or the amount of gas to be allowed to each customer", as respondent contends.

█ The question as to whether the commission's orders are supported by competent evidence, or are contrary to the evidence, or whether its action may have been arbitrary, are embraced within an investigation of the charge that it has not regularly pursued its authority. This court's review and determination of such issues is neither an assumption of the prerogatives of the commission, nor a substitution of the judgment of the court for that of the commission.

Petitioners again assert that there is no limit to the amount of gas available for southern Idaho, and that our conclusion to the contrary is unwarranted. We were in error in saying that the allocation of 33,149 Mcf of peak day gas was allocated for use in Idaho by the FPC. That error we have corrected. The fact is, the allocation was made by the pipeline corporation in its market estimates which were submitted to, and approved by, the FPC. In its order the FPC, after referring to the pipeline company's utility and industrial estimates, said:

"In addition Pacific will have available 8,350,800 Mcf of gas in the third year with a maximum day volume of 15,000 Mcf for which no market has been definitely assigned." FPC Order No. 271

This appears to mean that 33,149 Mcf peak day gas is definitely assigned to the Idaho market, and that the balance of the pipeline's available gas (except the 15,000 Mcf) has been definitely assigned to other markets. It is to be noted that the FPC corrected its order some two weeks after it was made, by adding the word "definitely" in the sentence here quoted. Also, it should be noted that the full amount of gas thus assigned to Idaho may not be available until the third year of the pipeline's operation. The federal commission's order shows that the pipeline's estimates reach their maximum in the third year. That is the year in which respondent estimated its sales at 63,608 Mcf.

On this subject, respondent's expert, Mr. Carpenter, testified there was no question but that it would be necessary to go before the FPC to get a larger allotment. The conclusion is inescapable that the record before the commission shows only 33,149 Mcf of peak day gas is to become available for the Idaho market within the first three years of the pipeline's operation.

Respondent now urges the court to judicially notice an application made May 23, 1955—amended July 18, 1955—by the pipeline company to the FPC for authority to import gas from Canada, estimating an additional 71,509 Mcf per day to be sold in the area already covered by its existing certificate. We are urged to notice this application because it is published in the Federal Register. Even so, we cannot, nor can the commission, speculate as to any proportionate amount of such additional

gas which may eventually be made available to Idaho.

Moreover, petitioner correctly urges upon us that the commission, not the court, is the fact finding body. We cannot take testimony or receive additional evidence. The legislature has specifically limited our review in that respect.

"No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it." § 61–629, I.C.

 A rehearing might be helpful in clearing up fringe areas of confusion and disagreement, and we would be inclined to grant a rehearing in such an important case but for the fact that it is now apparent the case must go back to the commission for further proceedings by it, in accordance with §§ 61–629 and 61–624, I.C. Oregon Short Line R. Co. v. Public Utilities Commission, 47 Idaho 482, 276 P. 970. A rehearing in this court would only further postpone the ultimate conclusion of a matter vital to the public interest.

Rehearing denied.

PORTER and SMITH, JJ., concur.

ANDERSON, J., with whom KEETON, J., concurs (dissenting).

I have reexamined the issues and the petition for rehearing and conclude that the original orders of the commission should be affirmed on the ground that there appears substantial and competent evidence to support the orders, and no reversible error appears in the proceedings had before the commission. However, I feel that the granting of a rehearing in this case would only delay the matter without changing the result arrived at by the majority and therefore concur in denying the petition for rehearing.