582 P.2d 720

**IDAHO POWER COMPANY, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

No. 12238.

Supreme Court of Idaho.

July 13, 1978.

Fred D. Decker of Parry, Robertson, Daly & Larson, Twin Falls, for appellant.

Wayne L. Kidwell, Atty. Gen., and Michael C. Dotten, Asst. Atty. Gen., for respondent Idaho Public Utilities Commission.

Jess B. Hawley, Jr., of Hawley, Troxell, Ennis & Hawley, Boise, and Francis N. Marshall and James N. Roethe, San Francisco, Cal., for respondent FMC Corp.

McFADDEN, Justice.

On May 30, 1975, appellant Idaho Power Company (hereinafter Idaho Power) applied to respondent Idaho Public Utilities Commission (hereinafter IPUC) for electrical service rate increases for its general and named special service contract customers. On July 3, 1975, Idaho Power also applied for electrical service rate increases for power supplied to Monsanto Company. Both applications were consolidated for hearings and eleven intervenors were allowed to participate in the consolidated hearings. Idaho Power sought permanent annual Idaho revenue increases of approximately $25,000,000 for a proposed 8.43 percent rate of return on the company's submitted $606,786,000 Idaho rate base for the 1975 test year. By these applications Idaho Power sought a 25.7 percent increase in its annual gross revenues.

After conducting hearings, the IPUC issued Order No. 12307 on January 14, 1976, which adjusted Idaho Power's submitted Idaho rate base to $600,714,000 and authorized the company to receive an 8.23 percent rate of return on its adjusted Idaho rate base. Idaho Power was "authorized to increase its annual revenues in the amount of $17,100,000 per annum, and to spread such rate increases among its various classes of customers . . . ." The authorized spread of increased gross revenues allocated $1,686,000 of revenue increase to sales for resale.[1]

On January 16, 1976, Idaho Power filed a petition for clarification of IPUC Order No. 12307, which the IPUC treated as a petition for rehearing. On March 19, 1976, the IPUC issued Order No. 12399 modifying IPUC Order No. 12307. These modifications, with additions underlined and deletions stricken, are as follows:

The Company ~~will be authorized~~ should be permitted to increase its annual revenues in the amount of $17,100,000 per annum, and to spread such rate increases among its various classes of customers as follows:

. . . . .

1. Idaho Power's gross revenue deficiency and the IPUC's authorized spread of increased revenues to Idaho Power service customer groups allocated by IPUC Order No. 12307 is summarized below.

A. Gross Revenue Deficiency:

| | |
|---|---|
| Rate Base: | $600,714,000 |
| Rate of Return: | 8.23% |
| Net Operating Income Requirement | 49,438,000 |
| Less Net Operating Income Earned· | 41,077,000 |
| Net Operating Income Deficiency: | 8,361,000 |
| Multiplied by Income Tax Factor | 2.045% |
| Gross Revenue Deficiency: | $ 17,100,000 |

B. Allocated Spread of Revenue Increases:

| | |
|---|---|
| Residential: | $ 5,327,000 |
| Commercial-Industrial: | 2,759,000 |
| Irrigation: | 2,622,000 |
| Uniform Rate Contracts· | 1,215,000 |
| Street & area lighting: | -0- |
| J. R. Simplot· | 237,000 |
| FMC: | 2,470,000 |
| AEC: | 201,000 |
| Monsanto: | 583,000 |
| Sales for resale: | 1,686,000 |
| TOTAL | $ 17,100,000 |

THAT to provide the company with a rate of return of 8.23 per cent on the previously determined rate base for Idaho of $600,714,000, its annual gross revenues ~~should~~ would have to be increased by $17,100,000.

. . . . .

THAT the company should be authorized to file with the Commission new rate schedules, rules and regulations, including special contract schedules, for services other than sales for resale, utilizing the allocation or spread of increased revenue as adopted and set forth in the Conclusion of this order, page 15, in those amounts necessary to generate additional annual revenues in the amount of ~~$17,100,000~~ $15,414,000. The company should take appropriate steps to enable it to generate additional annual revenues from sales for resale in the amount of $1,686,000.

On April 15, 1976, Idaho Power perfected this appeal from the above orders pursuant to I.C. § 61–627. Intervenor FMC Corporation, as party respondent to the proceedings, also filed a brief.

It is helpful to note at the outset what is *not* at issue in the instant proceeding. Idaho Power does not challenge the reduction of the company's submitted Idaho rate base from $606,786,000 to $600,714,000, nor does it contest receiving an 8.23 percent rate of return on its Idaho investment instead of the requested 8.43 percent rate of return. Idaho Power admits that the IPUC is vested with jurisdiction to make these adjustments and that these portions of IPUC Order Nos. 12307 and 12399 are supported by substantial and competent evidence. The parties also agree that interstate sales for resale are within the exclusive jurisdiction of the Federal Power Commission and that the IPUC lacks jurisdiction to establish rates for sales for resale.

The crux of the controversy concerns the IPUC's allocation of $1,686,000 of Idaho Power's gross revenue deficiency to electrical operations that are located in Idaho but that produce power for interstate sales for resale. Idaho Public Utilities Commission Order No. 12307 authorized an 8.23 percent rate of return on a $600,714,000 Idaho rate as the IPUC's estimate of a "fair, just and reasonable" return on Idaho Power's Idaho rate base. That order, therefore, authorized permanent annual rate increases of $17,100,000 to meet the needed 8.23 percent rate of return found to be "fair, just and reasonable." However, IPUC Orders No. 12307 and No. 12399, in effect, reduce the Idaho revenue authorization by $1,686,000, stating: "The company should take appropriate steps to enable it to generate additional annual revenues from sales for resale in the amount of $1,686,000."

Idaho Power argues that since rate increases for sales for resale cannot be made without approval of the Federal Power Commission, IPUC Orders No. 12307 and No. 12399 force Idaho to receive $1,686,000 less than is needed to provide the company with a reasonable return on its Idaho investment. The $1,686,000 reduction of Idaho Power's Idaho gross revenues by IPUC Orders No. 12307 and No. 12399 only results in an 8.09 percent rate of return for Idaho services. Thus, Idaho Power argues that: (1) the IPUC cannot consider interstate facilities and revenues in determining intrastate rates; and (2) the authorized increase of $15,414,000 is not supported by the evidence and produces a rate of return that is $1,686,000 less than needed to provide the company with what the IPUC found to be a reasonable rate of return.[2] Idaho Power thus requests that the orders be set aside to allow the company to receive an 8.23 percent rate of return on its Idaho investment.

In response, the IPUC maintains that the adjusted Idaho rate base represents *all* Ida-

2. IPUC Order No. 12307, Findings of Fact Nos. XI and XII are reproduced below:

XI
THAT a rate of return of 8.23 percent on a rate base of $600,714,000 is in all respects fair, just and reasonable.

XII
THAT to provide the company with a rate of return of 8.23 percent on the previously determined rate base for Idaho of $600,714,000, its annual gross revenues should be increased by $17,100,000.

ho Power electrical operations located in Idaho producing power for both interstate and intrastate sales. None of the evidence submitted by Idaho Power, argues the IPUC, assigned a rate base for Idaho operations producing only intrastate power for Idaho retail consumers. Similarly, it argues that costs were not assigned to Idaho located operations producing only intrastate retail power supplies. In other words, the IPUC maintains that Idaho Power's original electrical power rate increase application did not separate *interstate* costs and facilities from its *intrastate* services. When confronted with this evidence, the IPUC states that it computed an estimated Idaho geographic rate base (Idaho operations producing both interstate wholesale and intrastate retail power), an estimated Idaho geographic expense schedule (both interstate wholesale and intrastate retail expenses) and an estimated fair rate of return on the Idaho geographic rate base for *all* Idaho operations. This computation, maintains the IPUC, produces a gross revenue deficiency for *all* Idaho Power operations located in Idaho producing both interstate and intrastate power supplies. In order to determine a gross revenue deficiency for only those Idaho located operations that produce intrastate power, the IPUC attributed $1,686,000 of the gross revenue deficiency to interstate sales for resale. Order No. 12307 is, therefore, an estimate by the IPUC of the submitted rate base that should be attributed to interstate sales for resale by Idaho located operations. To clarify its position, the IPUC issued Order No. 12399, explaining that Idaho Power was authorized to increase Idaho retail gross revenue receipts

by $15,414,000, and the $1,686,000 balance was an estimate of the revenue deficiency that should be allocated to Idaho operations producing power for interstate sales for resale. The orders did not attempt to authorize a $1,686,000 rate increase for interstate sales for resale nor attempt to force Idaho Power to receive $1,686,000 less than a fair rate of return on its Idaho intrastate investment.

■ The IPUC is vested with jurisdiction to regulate all rates charged by every public utility in the state for services, products or commodities. I.C. § 61–501. Whenever the IPUC finds that rates charged by a public utility for its services are unjust, the IPUC must establish just, reasonable or sufficient rates to be thereafter charged by the public utility. I.C. § 61–502.[3] Findings by the IPUC concerning public utility rate increases are conclusive on appeal if the overall effect of the rate charge established is reasonable and just. *Citizens Utilities Co. v. IPUC,* 579 P.2d 110 (Idaho Sup.Ct., 1978); *Agricultural Products Corp. v. Utah Power & Light Co.,* 98 Idaho 23, 557 P.2d 617 (1976); *Intermountain Gas Co. v. IPUC,* 97 Idaho 113, 540 P.2d 775 (1975). The scope of the court's appellate review is limited by I.C. § 61–629:

> *Matters reviewable on appeal—Extent of review—Judgment.*—No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order ap-

---

**3.** *61–502. Determination of rates.*—Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates, fares, tolls, rentals, charges or classifications, or any of them, demanded, observed, charged or collected by any public utility for any service or product or commodity, or in connection therewith, including the rates or fares for excursions or commutation tickets, or that the rules, regulations, practices, or contracts or any of them, affecting such rates, fares, tolls, rentals, charges or classifications, or any of them, are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provision of law, or that such rates, fares, tolls, rentals, charges or classifications are insufficient, the commission shall determine the just, reasonable or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts to be thereafter observed and in force and shall fix the same by order as hereinafter provided, and shall, under such rules and regulations as the commission may prescribe, fix the reasonable maximum rates to be charged for water by any public utility coming within the provisions of this act relating to the sale of water.

pealed from violates any right of the appellant under the Constitution of the United States or of the State of Idaho. Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside the order of the commission. In case the order of the commission is set aside the commission, upon its own motion or upon motion of any of the parties, may alter or amend the order appealed from to meet the objections of the court

. . ..

The court's general inquiry therefore is whether allocating $1,686,000 of Idaho Power's gross revenue deficiency to sales for resale resulted in a just, reasonable or sufficient rate charge for Idaho Power's electrical service to Idaho retail consumers.

 Interstate sales for resale encompass three categories of excess electrical power sales: long-term firm sales for resale; short-term firm sales for resale; and excess or dump sales for resale. Record, Vol. 16 at 2690. Long-term firm sales for resale are contractual commitments generally for more than twenty-five years for excess electrical power supplies; long-term firm sales for resale rates are fixed by the Federal Power Commission and may be modified only by application to the Federal Power Commission. Short-term firm sales for resale represent shorter term contractual commitments for excess electrical power, generally involving contracts for less than five years. These rates are established by mutual agreement of the parties, subject to approval by the Federal Power Commission. Excess or dump sales for resale are sales of excess power arising from decreased local demand or other causes and are made to meet the energy requests of the recipient during peak load hours of the day. These contracts establish a minimum price per unit of power to be sold, subject to approval by the Federal Power Commission, but the actual rate per unit of power sold is established by mutual agreement of the parties.

Idaho Power first contends that the IPUC cannot consider a public utility's interstate business in determining its rate of return for domestic or intrastate services.

In *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), the United States Supreme Court, in ruling that a utility's intrastate rates could not be so unreasonably low that their burden fell upon interstate facilities requiring higher interstate rates, stated:

> In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the state that the state can prescribe; and when it undertakes to prescribe rates not to be exceeded by the carrier it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for, out of a common fund; and that its capitalization is on its entire line, within and without the state,—can have no application where the state is without authority over rates on the entire line, and can only deal with local rates, and make such regulations as are necessary to give just compensation on local business.

*Id.* at 541–42, 18 S.Ct. at 432. However, courts have allowed a state regulatory agency to consider a public utility's inter-

state operations and revenues for the limited purpose of determining what rate of return would be reasonable for intrastate services. *Re Southern California Edison Co.,* 83 PUR 3d 437 (1969).

■ The standard of appellate review of the *methods used by the IPUC to compute intrastate rates* is well settled in this state:

> Our purpose is not to analyze each step of the rate-setting process to determine whether the regulatory agency was correct in its decision, but to look at the overall effect of the rate fixed to determine whether the return to the utility is reasonable and just. As the Supreme Court of the United States stated in *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944): "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."

*Agricultural Prod. Corp. v. Utah Power & Light Co.,* 98 Idaho 23, 27, 557 P.2d 617, 621 (quoting with approval *Intermountain Gas Co. v. IPUC,* 97 Idaho 113, 120, 540 P.2d 775, 782 (1975)). The IPUC could have determined a fair rate of return from Idaho intrastate customers by first determining an Idaho intrastate rate base representing Idaho operations producing power to be sold in intrastate commerce and then determining a fair rate of return thereon. Instead it chose to determine a fair rate of return from all Idaho operations and then to deduct the portion of the deficiency reflecting Idaho operations producing power for interstate sales for resale. So long as the IPUC did not exceed its jurisdiction and provided that the end result of the methods used by the IPUC to compute a utility's rate of return produce a "fair, reasonable or sufficient" result, the court's inquiry is at an end.

■ The issue still remains, however, whether the IPUC's authorized increase in gross revenue receipts produced a "just, reasonable or sufficient" rate increase. I.C. § 61–502. Because of the court's limited appellate review of public utility rate cases, if the authorized increase is supported by the evidence submitted to the IPUC, its orders must be affirmed.

■ In the instant case, the effect of the IPUC's action was to disallow a portion of an overall state gross revenue deficiency because part of the Idaho operations sold power in interstate commerce as sales for resale. In order to prevent subsidizing interstate sales for resale by Idaho retail customers, the IPUC was correct in discounting this portion of the utility's operations in determining intrastate rates *assuming that these sales had not previously been discounted* in Idaho Power's original rate increase application.

Idaho Power applied for electrical service rate increases in 1975, proposing an estimated total system rate base for *all company operations* during the 1975 test year of $678,752,000. Exhibit No. 21. Idaho Power assigned $606,786,000 to the total Idaho rate base and $71,966,000 to the total rate base in states other than Idaho. Exhibit No. 63. The IPUC made several adjustments to the proposed total Idaho rate base assignment, not otherwise relevant to the present inquiry, that reduced the total authorized Idaho rate base to $600,714,000. IPUC Order No. 12307. Following these adjustments by which $600,714,000 was assigned by the IPUC to the total Idaho rate base, Idaho Power assigned $71,471,000 to the total rate base in states outside Idaho. Exhibit No. 142. Of the $71,471,000 total rate base assignment to states other than Idaho, $34,426,000 were assigned to long-term firm sales for resale. Exhibit No. 142. Idaho Power also assigned approximately $1,900,000 of the total authorized Idaho rate base to the City of Weiser. Excess wholesale power sold to the City of Weiser is the only long-term firm sale for resale made to an Idaho resale customer. Mr. Finas C. Harvey, Director of Rate Research for Idaho Power, testified on rehearing:

Q. Have you made separation studies then as to the rate base that should be separated from Idaho which is not jurisdictional as to Idaho?

A. Yes. That's the basis of our filing that we put into the proceeding here.

. . . . .

. . . All of the exhibits assigned the rate base to the various states. Now, in the application presented to this Commission and the original one in last May, the rate increase we were requesting in that proceeding excluded any rate base related to sales for resale for the long term from the utilities in the State of Idaho.

The City of Weiser was deducted from the state rate base in determining the revenue requirement from ultimate consumers, so that separation was made in our original filing.

Q. And it was made in what amount from your rate base that you contend was jurisdictional?

A. The total City of Weiser rate base was approximately $1,900,000, and that was deducted from the total Idaho rate base in our application in determining the revenue requirement for the State of Idaho.

Q. That was the only rate base that was deducted?

A. That is correct. It's the only one [long-term firm sale for resale] that's made within the State of Idaho.

Q. And you deducted no other rate base from the State of Idaho that is nonjurisdictional?

A. In the total Idaho assignment; that is correct.

Record, vol. 16 at 2727–29. That all long-term firm sales for resale by Idaho located operations were deducted from Idaho Power's original electric service rate increase application was uncontradicted on rehearing. The justification for assigning a portion of the total Idaho rate base assignment to long-term firm sales for resale only was explained by Mr. Harvey.

Q. It follows, does it not that . . . the power which is embraced within these long-term firm sales for resale is generated by the total system facilities no matter where located?

A. The power for the long-term firm sales for resale is generated in the total system common power system power supply, and each of those sales, long-term, depending upon the state in which they may be located receives a portion of the common system power supply.

Record, vol. 16 at 2718–19.

Rather than assigning a portion of the state's total rate base to short-term firm sales for resale and excess (dump) sales for resale, the revenues produced by these shorter term sales in interstate commerce were credited by Idaho Power in its original application to the state that produced the electrical power. These sales were thus used to reduce the costs of producing intrastate electrical power. This means that Idaho retail expenses were reduced, the effect of which increases Idaho revenues and thereby reduces the amount of the needed rate increase. Since Idaho operations encompass approximately 89 percent of total Idaho Power operations, Idaho Power allocated 89 percent of the revenue generated by these sales to offset costs incurred in producing power for Idaho intrastate customers.

Q. Is any rate base allocated to excess and short-term firm sales for resale?

A. No.

Q. Why is not such an allocation made?

A. An electrical plant is not planned nor constructed for short-term firm or excess energy sales for resale. Those sales result from temporary surplus system generation for above median water conditions that may or may not occur in any one year. Therefore, no rate base can be assigned to those sales, and the revenue resulting, which is credited to the states, accrues to the benefit of the rate payer of the state.

Record, Vol. 16 at 2713–14.

Q. How are revenue generated by short-term firm and non-firm sales for

resale or what we have called excess sales handled in your cost of service study?

A. They are deducted from operating expense.

Q. What effect does this deduction have on rates payers in general and on Idaho rate payers specifically?

A. It reduces the cost to be born by all rate payers. Idaho rate payers are credited with 89 cents of each dollar of short-term firm and excess sales for resale.

Record [Mr. Harvey], vol. 16 at 2715. This testimony was also uncontroverted on rehearing before the IPUC.

It thus appears that Idaho Power submitted evidence of an Idaho intrastate rate base, exclusive of all sales for resale. This Idaho intrastate rate base was the basis of the IPUC's computation of Idaho Power's gross revenue deficiency. The net effect of determining a gross revenue deficiency based on an Idaho rate base exclusive of all sales for resale, and then requiring a portion of the revenue deficiency to be borne by sales for resale is to twice deduct sales for resale. Based on the evidence submitted, the IPUC found "That a rate of return of 8.23 percent on a[n Idaho] rate base of $600,714,000 is in all respects fair, just, and reasonable." The product of this computation produces an Idaho gross revenue deficiency, after adjustment for taxes, of $17,100,000. The items of interstate sales for resale were already reflected in the computation in the form of a lower Idaho rate base and a deduction from operating expenses resulted in increased Idaho revenues. To deduct these sales for resale twice produces a rate of return of only 8.09 percent and is less than the rate of return found by the IPUC to be fair, just and reasonable. Orders based on findings by the IPUC that are not supported by the evidence must be set aside on appeal:

We recognize that the Public Utilities Commission is a fact finding and adminis-trative body, exercising great discretionary powers, and that this court's review of its orders is limited. Const. Art. 5, § 9; § 61–629, I.C.; *State ex rel. Taylor v. Union Pac. R. Co.,* 60 Idaho 185, 89 P.2d 1005; *In re Mountain States Tel. & Tel. Co.,* 76 Idaho 474, 284 P.2d 681. However, embraced within that review and within the determination of the question as to whether it has regularly pursued its authority, the findings of the commission must be based upon substantial evidence; its findings not thus supported, or which are contrary to the evidence, cannot be accepted by the court as a basis for upholding the conclusions of the commission. Const. Art. 2, § 1; *Idaho Power & Light Co. v. Blomquist,* 26 Idaho 222, 141 P. 1083; *Nez Perce Roller Mills of Lewiston v. Public Utilities Comm.,* 54 Idaho 696, 34 P.2d 972; *Mountain View Rural Tel. Co. v. Interstate Tel. Co.,* 55 Idaho 514, 46 P.2d 723; *State ex rel. Taylor v. Union Pac. R. Co.,* 60 Idaho 185, 89 P.2d 1005; *Application of Nichols,* 68 Idaho 490, 199 P.2d 255; *Application of Lewiston Grain Growers,* 69 Idaho 374, 207 P.2d 1028; *Application of Pacific Tel. & Tel. Co.,* 71 Idaho 476, 233 P.2d 1024.

" 'An order based upon a finding made without evidence, (*The Chicago Junction case,* 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667), or upon a finding made upon evidence which clearly does not support it (*Interstate Commerce Commission v. Union Pac. R. Co.,* 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308), is an arbitrary act against which courts afford relief.' *Northern Pac. R. Co. v. Department of Public Works,* 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. [836] 837." *Oregon Short Line R. Co. v. Public Utilities Comm.,* 47 Idaho 482, at page 484, 276 P. 970, at page 971.

*Applications of Intermountain Gas Co.,* 77 Idaho 188, 202, 289 P.2d 933, 943 (1955).[4]

---

4. Additionally, material findings of fact by the IPUC appear to be inherently inconsistent. The IPUC found that present Idaho Power electrical service rates were not fair, just and rea-sonable (IPUC Order No. 12307, Finding of Fact No. V), but that new rates reflecting an 8.23 percent rate of return on an Idaho rate base of $600,714,000 would be in all respects

Insofar as IPUC Orders No. 12307 and No. 12399 allocate $1,686,000 to sales for resale, they are not supported by the evidence submitted and are set aside.

SHEPARD, C. J., and DONALDSON, BAKES and BISTLINE, JJ., concur.

fair, just and reasonable (IPUC Order No. 12307, Finding of Fact No. XI). This requires an annual gross revenue increase of $17,100,-000. However, on rehearing the IPUC modified its findings of fact to state that Idaho Power would have to increase its annual gross revenues by $17,100,000 in order to receive a fair rate of return (IPUC Order No. 12399, Amended Finding of Fact No. XII), but Idaho Power was only authorized to file new rate schedules providing a $15,414,000 annual increase (IPUC Order No. 12399, Amended Finding of Fact No. XVIII). A judgment or order based on inconsistent material findings of fact should not be sustained on appeal. *Henderson v. Nixon,* 66 Idaho 780, 168 P.2d 594 (1946).