690 P.2d 350

**IDAHO STATE HOMEBUILDERS, Appellant,**

v.

**WASHINGTON WATER POWER, and Idaho Public Utilities Commission, Respondents.**

No. 13622.

Supreme Court of Idaho.

Oct. 31, 1984.

Richard H. Greener, Fredric V. Shoemaker, of Clemons, Cosho & Humphrey, Boise, for appellant.

Charles W. Hosack of Smith, Hosack & Potter, Coeur d'Alene, for respondent Washington Water Power Co.

David Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., and Michael S. Gilmore, Deputy Atty. Gen., Boise, for respondent Idaho Public Utilities Com'n.

Tom Ambrose and Morgan W. Richards, Jr., of Moffatt, Thomas, Barrett & Blanton, Chartered, Boise, for amicus curiae Intermountain Gas Co.

Racine, Huntley, Olson, Nye & Cooper, Pocatello, for amicus curiae Idaho Irr. Pumpers Ass'n, Inc.

Robert M. Tyler, Jr., of Elam, Burke, Evans, Boyd & Koontz, Boise, for amicus curiae Idaho Power.

Michael F. Peacock of Brown, Peacock, Keene & Boyd, Kellogg, for Bunker Hill.

SHEPARD, Justice.

This is an appeal from an order of the Public Utilities Commission requiring the imposition of a non-recurring charge of $50 per kilowatt on the installation of or conversion to electric space heating after March 1, 1980. The charge was only imposed upon those customers who had the option of choosing natural gas for space heating purposes. There are no material facts in dispute and the sole issue is whether the Commission's imposition of said contribution charge was an act in excess of its authority. We earlier held that the Commission did exceed its authority, and we therefore set aside the order. *See* Idaho State Home Builders v. Washington Water Power, 1982 Opinion No. 21 (April 15, 1982).

The Commission filed a petition for rehearing, which was granted, and upon that rehearing Idaho Power Company, Idaho Irrigation Pumpers and Intermountain Gas Company were Amicus Curiae. The previous Opinion of the Court dated April 15, 1982 is withdrawn and this opinion is substituted therefor.

Washington Water Power is a public utility operating in parts of eastern Washington and northern Idaho and is primarily engaged in the generation, transmission and distribution of electricity and the distribution of natural gas. In March of 1979, Water Power filed simultaneous applications, seeking rate increases in electrical and gas service to its northern Idaho customers. Although those applications were consolidated, this appeal relates only to the electrical service application.

After hearings on the applications, the Commission found that "[t]he combined effect of Washington Water Power's low electric rates and the rapid growth in customer usage has become Water Power's most critical problem." That conclusion, in turn, was based in large part on undisputed facts, those being that space heating with electricity is the largest single end use of energy in a residence or small commercial business; that the utility thus has a problem of concentrating load requirements in the four to six coldest months of the year, and because electric heat systems are weather sensitive, the utility cannot spread the load created by those systems; that the coldest weather period coincides with Water Power's peak demand, and consequently, electric heating systems contribute more than any other use of electricity to Water Power's need for new generating

facilities; that approximately 93% of Washington Water Power's new residential customers choose electricity for space heating; that between 1969 and 1978, Water Power experienced a 35.3% increase in kilowatt hours of consumption per residential customer, and a 85.2% increase in total kilowatt hours consumed by the residential class; that such growth in demand for electricity occurred notwithstanding Water Power's termination in 1972, of advertising practices aimed at promoting the use of electricity for space heating; that Water Power experienced a similar, though less dramatic, increase in consumption among its commercial customers; that Water Power estimated the demand for its electricity service would increase at an annual rate of 4% during the next few years; that part of the large demand for electricity results from Water Power's rates being the lowest in the nation for an investor-owned utility; that Water Power's rates are approximately one-fifth those charged by utilities in New York City; that the price of natural gas historically has been higher than the price of electricity, so that Water Power's customers are discouraged from choosing natural gas as an alternative to electric space heating; that Water Power projected no growth in demand for its natural gas service in 1979; that the ability of Water Power to provide electricity has been jeopardized, particularly in the winter months, when its load requirements peak; that Water Power will be unable to meet demands unless new generating facilities are completed and placed in service as scheduled; and that, as a further complication, the generating units planned by Water Power have been or currently are delayed in their construction.

Water Power's low electrical rates are the result of a historical abundance of cheap hydroelectric power, most of which is generated by federally financed dams. The rates which an electric utility is allowed to charge are based largely upon the cost of providing service generation, transmission, and distribution plants valued at their historic costs. The imbedded cost of Water Power's generating facilities, *i.e.*,

the capital costs upon which its current electrical rates are based, is approximately $220 per kilowatt. By contrast, marginal cost of its new thermal generating facilities is approximately $800 per kilowatt, and estimates for future generating facilities range from $1500 to $2000 per kilowatt. On the other hand, imported and domestic prices for alternative energy sources, such as oil and natural gas, are not tied to the imbedded cost of service, or to the historic imbedded cost of fuel production, but are priced at or near their marginal costs.

As a means of moderating the demand for electricity during the winter months, Water Power proposed the imposition of seasonal rates for residential customers, *i.e.*, a lower rate for the six summer months, and a higher rate for the six winter months. Thus, Water Power sought to reflect in its rate structure the cost differences that exist in supplying electricity in capacity during seasonal peak periods as compared to non-peak periods. Through that proposal for increased pricing, Water Power also sought to advise its customers to minimize their usage during the winter peak period. That proposal was rejected by the Commission and the Commission required Water Power to impose upon all of its customers, whether residential, commercial or industrial, who installed or converted to electric space heating, the contribution charge which is the subject of this appeal.

The Commission found that the known regional natural gas reserves are projected to be adequate for the balance of this century, while regionally, electricity is becoming an increasingly scarce form of energy. The Commission further found that the use of natural gas is purchasable as a commodity and does not increase incrementally the cost of all other electrical power through additional loads on the entire electrical system. In contrast, the construction and firing of new electrical generating capacity is subject to escalating capital costs and time lags. The Commission reasoned that Washington Water Power's low electrical rates were misleading and had caused, and

would continue to cause, Water Power's customers to make their space heating choices on the basis of very short term considerations. The Commission determined that it was necessary to send to Water Power's customers a price "signal" which would more accurately reflect the cost and availability of electricity.

The Commission indicated that it doubted that rate design changes as such would sufficiently deter the installation of new electric space heating, and thus the Commission required Water Power to impose the nonrecurring charge of $50 per installed kilowatt of capacity on all customers who installed electric space heating, or converted to electric space heating following March 1, 1980. The Commission further ordered that those contribution charges be credited to a specific account and used by Water Power to offset the cost of its construction work in progress for new generating facilities.

Thereafter, the Commission granted Water Power's request for additional hearings on the space heating contribution charge and a suspension of the effective date. Appellant, a non-profit trade association comprised of homebuilders and allied industries, was granted leave to intervene. Additional hearings were conducted and indicated that residential electric heating furnaces range in capacity from 20 to 40 kilowatts and thus the contribution charge for a typical residence would range from $1000 to $2000. Those hearings also indicated that the charge would not effectively discourage customer dependence upon electricity for space heating purposes in areas where natural gas was not available. Hence, the Commission altered its prior order by excepting from the contribution charge, those customers who did not have access to natural gas for space heating purposes. The charge was made effective March 1, 1980.

On appeal, appellant-intervenor asserts that the contribution charge must be struck down because the Commission acted in excess of its statutory authority in imposing a charge that unlawfully discriminates as between geographically adjacent communities and as between customers who utilized electricity for space heating prior to March 1, 1980, as contrasted with customers who sought to use electricity for space heating following March 1, 1980. We do not find it necessary to address the issue of geographic discrimination since we hold that the contribution charge unlawfully discriminates between "new" and "old" customers of Water Power.

■■■ The Idaho Public Utilities Commission has no authority other than that granted to it by the legislature. It exercises a limited jurisdiction, and nothing is presumed in favor of its jurisdiction. *Washington Water Power Co. v. Kootenai Environmental Alliance*, 99 Idaho 875, 591 P.2d 122 (1979); *United States v. Utah Power & Light Co.*, 98 Idaho 665, 570 P.2d 1353 (1977). The Commission is a creature of statute and absent compliance with the enabling statutes, the Commission lacks jurisdiction. *Washington Water Power Co. v. Kootenai Environmental Alliance*, supra; *Arrow Transportation Co. v. Idaho Public Utilities Commission*, 85 Idaho 307, 379 P.2d 422 (1963). Where necessary to enable the Commission to exercise the powers expressly granted to it, and once jurisdiction is clear, the Commission is allowed all power that is either expressly granted by the statute or which may be fairly implied. *Washington Water Power Co. v. Kootenai Environmental Alliance*, supra; *United States v. Utah Power & Light*, supra.

■ In the instant case and in cases similar to this one, the scope of review is limited to a determination of "whether the Commission regularly pursued its authority" and whether the constitutional rights of the appellant have been violated by the Commission's action. I.C. § 61–629; *Utah Power & Light Co. v. Idaho Pub. Util. Comm'n*, 102 Idaho 282, 629 P.2d 678 (1981).

The Commission is specifically delegated authority to regulate and fix the charges collected by a utility. I.C. § 61–502 provides:

"61–502. Determination of rates.— Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates, fares, tolls, rentals, charges or classifications, or any of them, demanded, observed, charged or collected by any public utility for any service or product or commodity, or in connection therewith, including the rates or fares for excursions or commutation tickets, or that the rules, regulations, practices, or contracts or any of them, affecting such rates, fares, tolls, rentals, charges or classifications, or any of them, are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provision of law, or that such rates, fares, tolls, rentals, charges or classifications are insufficient, the commission shall determine the just, reasonable or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts to be thereafter observed and in force and shall fix the same by order as hereinafter provided, and shall, under such rules and regulations as the commission may prescribe, fix the reasonable maximum rates to be charged for water by any public utility coming within the provisions of this act relating to the sale of water."

I.C. § 61–503 provides:

"61–503. Power to investigate and fix rates and regulations.—The commission shall have power, upon a hearing, had upon its own motion or upon complaint, to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract or practice, or any number thereof, or the entire schedule or schedules of rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices, or any therof, of any public utility, and to establish new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices or schedule or schedules in lieu thereof."

The Commission argues that the contribution charge is within the ambit of its powers to regulate the charges which a utility may collect from its customers.

■ It is well recognized that the Commission has broad authority to regulate and fix rates. *Idaho Power Co. v. Idaho Pub. Util. Comm'n*, 99 Idaho 374, 582 P.2d 720 (1978); *Citizens Utilities Co. v. Idaho Pub. Util. Comm'n*, 99 Idaho 164, 579 P.2d 110 (1978); *Agricultural Prod. Corp. v. Utah Power & Light Co.*, 98 Idaho 23, 557 P.2d 617 (1976); *Intermountain Gas Co. v. Idaho Pub. Util. Comm'n*, 97 Idaho 113, 540 P.2d 775 (1975); *Idaho Power & Light Co. v. Blomquist*, 26 Idaho 222, 141 P. 1083 (1914).

■ The authority of the Commission to fix rates and charges, however, is not unbridled. A utility is forbidden to treat a customer preferentially through its rates and charges, or to maintain unreasonable differences in its rates and charges as between classes of service. I.C. § 61–315 provides:

"61–315. Discrimination and preference prohibited.—No public utility shall, as to rates, charges, service, facilities or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service. The commission shall have the power to determine any question of fact arising under this section."

Since the Commission has power to regulate and fix charges and rates, but a utility is enjoined from establishing rates or charges which are preferential or discriminatory, it follows by implication that the Commission's authority may only be exercised in such a way as to fix non-discriminatory, and non-preferential rates and charges. *See also*, I.C. §§ 61–301 (requiring imposition of only just and reasonable charges by utilities); 61–502 (authorizing the Commission to correct unjust or preferential rates); *Utah-Idaho Sugar v. Inter-*

*mountain Gas Co.*, 100 Idaho 368, 597 P.2d 1058 (1979).

■■■ Not all differences in a utility's rates and charges as between different classes of customers constitute unlawful discrimination or preference under the strictures of I.C. § 61–315. A reasonable classification of utility customers may justify the setting of different rates and charges for the different classes of customers. *Utah-Idaho Sugar Co. v. Intermountain Gas Co., supra.* Any such difference (discrimination) in a utility's rates and charges must be justified by a corresponding classification of customers that is based upon factors such as cost of service, quantity of electricity used, differences in conditions of service, or the time, nature and pattern of the use. *Utah-Idaho Sugar Co. v. Intermountain Gas Co., supra.* We have found justification for rate discrimination as between customers within a schedule and as between customers in different schedules. *Grindstone Butte Mutual Canal Co. v. Idaho Pub. Util. Comm'n*, 102 Idaho 175, 627 P.2d 804 (1981); *Utah-Idaho Sugar Co. v. Intermountain Gas Co., supra.* We have upheld as justified a demand charge applicable only to large volume, non-interruptible gas customers, *Utah-Idaho Sugar Co. v. Intermountain Gas Co., supra,* and a 19.6% increase for high volume-high load factor pump irrigators at one end of a schedule and a 34.5% decrease for low volume-low load factor customers at the other end. *Grindstone Butte, supra.*

Following the hearings, the Commission stated a two-fold objective in its retention of the charge:

"The contribution was originally imposed, and is being retained, for two purposes: first, to alert customers making space heating decisions to costs associated with their decisions, and second, to require that customers choosing electric space heating bear a portion of the costs attributable to that choice ... Our goal is to reduce consumer dependence upon electric energy for space heating purposes."

Whether authority exists in the Commission to set rates or establish charges which are designed to "reduce consumer dependence on electric energy for space heating purposes" is a question we do not answer today. The Court's opinion in *Grindstone Butte, supra,* indicates that the Commission, in its setting of rates, may consider a variety of factors. The Court there stated, "We do not find one criterion to be necessarily more essential than another." It further noted, "Cost of service is not a *per se* essential element without which rate making is invalid. It is an important criterion and, in a given case, it may even be largely dispositive of the issue of basis for price differentiation...." The Court further stated, *"Absent a legislative pronouncement to the contrary, we find it within the Commission's jurisdictional province to consider in its rate making capacity all relevant criteria including energy conservation and concomitant concepts of optimum use and resource allocation." See Grindstone Butte, supra,* 102 Idaho at 180–181, 627 P.2d at 809–810. The *Grindstone Butte* Court specifically noted, however, that in that record there existed cost of service factors. The Court also noted that "each case must depend very largely upon its own special facts." *Id.,* 102 Idaho at 179–180, 627 P.2d at 808–809, *citing Kiefer v. City of Idaho Falls*, 49 Idaho 458, 289 P. 81 (1930).

We specifically note that our decision today does not address the question of the validity of Water Power's seasonal rates proposal to increase the rates of all customers during its peak load period. While that proposal appears to have as its objectives conservation of energy resources, and financial pressure advice to its customers, at the least, that proposal did not appear to suffer the infirmity of unlawful rate discrimination and preference. Similarly, we do not decide other questions, such as whether the Commission could have ordered Water Power to discontinue and refuse electrical service to any new space heating customers following March 1, 1980. Such an order would clearly involve large

policy considerations of forcing alternative energy sources upon potential customers, or in extreme cases, requiring shifts in population and/or economic bases. As to these monumental policy decisions and the authority of our Public Utility Commission to make such determinations, we note the critical need for legislative consideration and action.

■ In the instant case, the Commission's order, which differentiates between customers using electricity for space heating prior to March 1, 1980, and customers who install or convert to electric space heating after that date, is an invalid classification and violates the legislative prohibition against discriminatory or preferential rates. Here the pattern, nature and time of usage (meaning both time of year and time of day) of electricity for space heating purposes did not change on March 1, 1980. The quantity of electricity used by customers of Washington Water Power prior to March 1, 1980 does not differ in significance from the quantity to be used by those installing or converting to electric space heating after March 1, 1980. Likewise, we perceive no difference in criteria of cost of service or difference in condition of service as between the two classes. Hence we hold that the purported classification is based on none of the factors which we have in prior cases deemed essential to a reasonable classification.

The instant case presents no factors such as when a non-recurring charge is imposed upon new customers because the service they require demands an extension of existing distribution or communication lines and a charge is imposed to offset the cost of the utility's capital investment.

Here, the Commission found that customers choosing electricity for space heating purposes contributed most to Washington Water Power's needs to invest in expensive new generating facilities. Therein since the charges were only imposed on new customers, the Commission evidently assumed that only "new" customers were responsible for the level of demand, but that premise has no basis in either the record or in economic theory. That basic flaw is perhaps best illustrated in the record by the testimony of one Dr. Power, Chairman of the Economics Department of the University of Montana, who stated:

"[T]rying to track 'causal' responsibility for costs can quickly degenerate into a metaphysical debate similar in character to the famous medieval debate over how many angels can fit on the head of a pin. From the economist's perspective, a new customer is no more responsible for the level of demand than an old customer. The need for additional capacity can be avoided either by the old customer reducing demand or by the new customer abandoning plans to purchase electricity. An old electric heat customer in an uninsulated house or an existing industrial customer with an old, energy inefficient production process or an industrial customer who could produce thermal electric energy more cheaply than Washington Water Power, et cetera, are all as responsible for the rising demand for electric energy and power as the new home heating customer is."

In conclusion, we hold that the contribution charge imposed by the Commission on Washington Water Power's customers who install or convert to electric space heating after March 1, 1980 unreasonably and unlawfully discriminates between those "new" customers and those customers who have utilized electricity for space heating purposes prior to that date. Therefore, those portions of the Commission's orders are set aside. Costs to appellant.

No attorney's fees on appeal.

BAKES and BISTLINE, JJ., and McFADDEN, J. Pro Tem., concur.

DONALDSON, C.J., concurs in the result.

BISTLINE, Justice, concurring specially:

I concur in the result reached by the majority, but not without some strong reservations. Today's opinion will seem to some to be inconsistent with our decision in

*Grindstone Butte Mutual Canal Co. v. Idaho Public Utilities Commission,* 102 Idaho 175, 627 P.2d 804 (1981), decided just one short year ago. We held in *Grindstone,* with only the author of today's majority opinion dissenting, that "it [is] within the Commission's jurisdictional province to consider in its rate-making capacity all relevant criteria including energy conservation and concomitant concepts of optimum use and resource allocations." 102 Idaho at 181, 627 P.2d at 810. While today's opinion does not expressly overrule this holding, it certainly runs contrary to it. The majority states that "[a]ny such difference (discrimination) in a utility's rates and charges must be justified by a corresponding classification of customers that is based upon factors such as cost of service, quantity of electricity used, difference in conditions of service, or the time, nature and pattern of the use." The difference in charges here, however, was clearly based on both *future* cost of service and an attempt to achieve "optimum use and resource allocation." The record supports the Commission's findings as to these two points, and the majority does not dispute this.

The majority's reason for reversing, with which I am not unsympathetic, is that imposing the hookup charge on new customers discriminates against those customers in favor of old customers. At first blush, this appears to be true. Dr. Power's comments on the utility of tracking causal responsibility in the field of economics is correct to a point; it is difficult to say whether the old customers or the new customers "cause" the need for new capital outlays in an economic sense.[1] Upon closer examination, however, it is apparent that new customers "causing" additional capital outlays was not the sole basis for the Commission's decision. The Commission, as admitted by the majority, also found that the one-time hookup fees were necessary as a pricing signal to alert new customers that (1) the cost of electricity was going to increase dramatically in the near future if growth in electrical demand continued, and (2) that alternatives that were potentially less expensive were available. The distinction between old and new customers for *this* reason is entirely rational. The cost to old customers of switching heat sources would be greater than the costs of initially installing alternative heat sources for new customers. Additionally, the *information* available to new customers, as well as to the PUC and the utilities, concerning the real costs of electrical energy is much greater than the information available at the time that old customers first began using electrical energy. New customers are therefore capable of making more informed choices as to energy sources and costs. Thus, there appears to be a rational basis for the distinction drawn by the Commission in furtherance of its jurisdiction to "consider ... all relevant criteria including energy conservation and concomitant concepts of optimum use and resource allocation." *Grindstone,* 102 Idaho at 175, 627 P.2d 804.

I concur because I am not convinced that the hookup fee imposed is a "rate" which the Commission is statutorily authorized to impose and because I am concerned that new Washington Water Power customers who live on the Washington side of the state line may not be paying the same fee as Idaho customers, although they may contribute equally to new capital costs and may have the same resource choices available to them.[2] Due to the fact that the Court has decided to give this case priority, I will reserve elaboration and further

---

1. I note that this argument could also be applied to virtually every new cost imposed on an electrical system, but that this does not necessarily preclude the Commission from fixing responsibility for costs in its rates. Obviously, the Commission is not required to adhere to any particular economic theory in fixing rates; since choosing one particular economic theory may itself determine the outcome. *See* Baker, The Ideology of the Economic Analysis of Law, 5 Philosophy & Public Affairs 3 (1975). As the majority concedes, other factors enter into the decision-making process.

2. Nothing in the record indicates whether the Commission's Washington counterpart has imposed a similar fee.

thought on these issues until a petition for rehearing, if any, is filed.